IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PAMELA J. KELLEY,
     Plaintiff,

vs.                                   Case No.: 3:18cv1423/EMT

ANDREW SAUL,
Acting Commissioner of Social Security,[1]
     Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 10, 11). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), he is automatically substituted for Nancy A. Berryhill as the Defendant in this case.

## I.     PROCEDURAL HISTORY

On May 26, 2015, Plaintiff filed an application for DIB alleging disability beginning four days prior, on May 22, 2015 (tr. 10).[2]  Her application was denied initially and on reconsideration, and thereafter she requested a hearing before an administrative law judge ("ALJ").   A hearing was held on March 9, 2017, and on June 22, 2017, the ALJ issued a decision finding Plaintiff "not disabled," as defined under the Act, at any time through the date of the decision (tr. 10–19).   Plaintiff requested review by the Appeals Council, which denied the request (tr. 1–6).   Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.   *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007).   This appeal followed.

## II.    FINDINGS OF THE ALJ

In denying Plaintiff's claim, the ALJ made the following relevant findings:

(1)     Plaintiff meets the insured status requirements of the Act through December 31, 2019[3];

(2)     Plaintiff did not engage in substantial gainful activity after May 22, 2015, the alleged onset date;

---

[2] All references to "tr." refer to the transcript of the Social Security Administration record filed on December 27, 2018 (ECF No. 13).   Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

[3] Thus, the time frame relevant to Plaintiff's claim for DIB is about a two-year period, from May 22, 2015 (date of alleged onset) through June 22, 2017 (date of the ALJ's decision).

(3)     Plaintiff has one severe impairment: degenerative disc disease in the form of lumbar spondylosis with myelopathy;

(4)     Plaintiff has no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 440, Subpart P, Appendix 1;

(5)     Plaintiff has the residual functional capacity ("RFC") to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b); and

(6)     Plaintiff was able to perform her past relevant work as a daycare teacher during the relevant period, as the requirements of that work are consistent with her RFC; therefore, she was not under a disability, as defined in the Act, from May 22, 2015, through June 22, 2017, the date of the decision.

(tr. 10–19).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence in the record and was a result of application of proper legal standards.    *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).    "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."    *Boyd*

*v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if, in light of the record as a whole, the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); *Lewis*, 125 F.3d at 1439; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938)); *Lewis*, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the claimant not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, she is not disabled.

2.    If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.    If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.    Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the

existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work identified by the Commissioner. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.   Personal and Employment History

At the time of the hearing before the ALJ on March 9, 2017, Plaintiff was 56 years of age, stood 5'6'' tall, and weighed 180 pounds (tr. 60, 62). She testified she had a high school education and previous work as a teacher at a childcare center where she cared for children aged four to twelve (tr. 60, 64).[4]

Plaintiff noted she can drive, bathe, and dress herself with some assistance; shop for groceries; and cook in increments; but she cannot do laundry, sweep, mop, or perform yard work (tr. 64–66). She testified she can stand for only ten minutes, has pain when she walks two blocks, and is limited in what she can carry (tr. 66, 71). She takes cyclobenzaprine, Duloxetine, oxycodone, and Aleve for her back (tr. 63, 312). Although these medications are helpful, they only decrease her pain from a

---

[4] Plaintiff also completed a Work History Report, on which she noted that all of her past work centered around childcare occupations and spanned from approximately July 1999 through May 2015 (tr. 252).

Case No.: 3:18cv1423/EMT

ten to a seven or eight on a ten-point scale, and they cause drowsiness (tr. 68–69, 263). Plaintiff also has received spinal injections, which helped "maybe for two days" (tr. 68).

B.    Relevant Medical History

Evidence that Pre-Dates the Relevant Period

In August 2010, Plaintiff underwent a bilateral laminectomy at L4, bilateral semi-hemilaminectomy at L3 and L5, bilateral foraminotomies at L3-4 and L4-5, internal stabilization of L3-S1, and lateral mass fusion from L3-S1 (tr. 422). A computed tomography ("CT") scan of the lumbar spine from July 20, 2011, showed adequate fusion but moderately severe faceted degenerative change at L1-L2 and L2-3 (tr. 381). About a year after the surgery, on September 19, 2011, Plaintiff underwent a re-exploration of the lumbar spine, an examination of the prior fusion, removal of previous hardware, L1-S1 internal stabilization and fusion, and posterior lateral mass fusion (tr. 379). She was diagnosed with lumbar myofascial pain syndrome, pseudarthrosis at L3-L4 and L4-5, lumbar spondylosis, status-post previous lumbar operation from L3-S1, hypertension, and tobacco use (*id.*). Neurosurgeon Michael L. Goodman, M.D., performed both procedures (*see, e.g.*, tr. 406, 427).

Following the re-exploratory surgery, in January 2012, Plaintiff reported "almost complete relief of her pain," although she noted she occasionally had bad days that seemed to correlate with the weather (tr. 375). Dr. Goodman released Plaintiff to work at "regular duties" (*id*.), and thereafter she saw him every few months (358–76).[5] Plaintiff provided varying reports regarding back and hip pain, but her straight leg raising tests were unremarkable (tr. 358–76). Moreover, according to Dr. Goodman in April 2012, post-surgical CT scans showed "adequate fusion across all operated levels with excellent bridging of the facet joints and good bone mass [with] no evidence of displacement of the stabilizing system" (tr. 373). Dr. Goodman encouraged Plaintiff to exercise and lose weight (tr. 358–76).

Plaintiff presented to William Belk, M.D., of Davis Highway Primary Care, to establish care on January 28, 2014 (tr. 559). She claimed to be in "constant pain" following the surgeries and stated, "Dr. Goodman has no good reason for it" (*id*.). She indicated she was working twenty hours per week (4 days/week, 5 hours/day) and was using Percocet, but needed more, as well as a TENS unit, which "help[ed]" (tr. 559). Dr. Belk observed Plaintiff to be in no acute distress and "well appearing" but "miserable" (tr. 560). He assessed lumbar spondylosis with myelopathy and

---

5 Plaintiff's Work History Report indicates she was working in several childcare positions at or about this time, including a position involving the care of four-year old children, a position as a youth summer camp counselor, and a position as a mini school bus driver (*see* tr. 252).

prescribed Oxycontin and physical therapy; he noted Plaintiff needed to return to Dr. Goodman (tr. 561). Plaintiff returned to Dr. Belk on February 11, 2014. She said she was getting "tired and spacey" on the Oxycontin and wished to discuss changing medication (tr. 556). Dr. Belk observed Plaintiff to be in no acute distress and "well appearing"; he switched her back to Percocet (tr. 557–58). Additional CT scans obtained in March 2014 revealed minor osteolysis at the tops of the pedicle screws at S1 bilaterally but no other abnormalities (tr. 359).

Plaintiff returned to Dr. Goodman on April 1, 2014, "complaining of pain" (tr. 435). Upon examination, Dr. Goodman determined the pain to be "associated with left hip tenderness"; he found Plaintiff's neurologic examination to be normal (*id*.). He referred Plaintiff to a "Dr. Morrison" for evaluation and advised Plaintiff to return to see him (Goodman) in two months (*id*.).[6] Seven months later, on November 3, 2014, Plaintiff presented to Etta Byrd, ARNP, of Dr. Goodman's office with complaints of continued lower back pain and worsening right hip pain (tr. 431). A physical examination was wholly normal (*see* tr. 433), despite Plaintiff's complaints of pain and other symptoms (*see* tr. 431).

---

[6] The court has found no indication in the record that Plaintiff followed up with the referral to Dr. Morrison, and neither the parties nor the ALJ have referenced such. It thus appears no such follow-up occurred.

Another CT scan, obtained December 1, 2014, revealed "[s]light medial course of the right L1 and L2 pedicle screws," solid fusion masses bilaterally, and subtle osteolysis around the left S1 screw (tr. 443). On December 2, 2014, ARNP Byrd met with Plaintiff and reviewed the CT results with her. Using laymen's terms, she explained that the CT of the lumbar spine showed no hardware failure at the L1-S1 fusion and only minimal bone growth at L4-L5 (tr. 429). ARNP Byrd examined Plaintiff and found her gait and muscle strength normal despite Plaintiff's complaints of back pain, aches, and muscle spasms (*id.*). She advised Plaintiff to see her primary care provider for a pain management referral and "possible DCS [dorsal column stimulation] trial"; she prescribed a corset lumbar brace for comfort and advised Plaintiff to follow up "as needed" (*id.*).

The file contains no additional records from Dr. Goodman's office, but Plaintiff did return to Dr. Belk every few months or so in mid to late-2014 through early May 2015. She complained of low back pain and, occasionally, of other ailments not at issue in this appeal (such as sinus issues and thrush) (*see generally* tr. 527–61). Although Dr. Belk noted on several occasions that Plaintiff appeared to be in pain, his treatment notes do not document any objective limitations upon physical examination or include any recommendations that Plaintiff restrict her

activities (*id*.). His records generally reflect that Plaintiff was treated conservatively with pain medication (*id*.).

Elsewhere, at the Gulf Coast Pain Institute, Plaintiff received a total of three lumbar epidural steroid injections ("ESI's") under fluoroscopy—on April 22, May 1, and May 15, 2015 (tr. 499, 496, 493). Each was administered to treat lower back and/or buttock pain, which at times reportedly radiated into the lower right extremity or bilateral lower extremities (*see id*.; tr. 494, 510).

Evidence from the Relevant Period (May 22, 2015, through June 22, 2017)

Dr. Belk's records show that as of June 1, 2015, Plaintiff was prescribed cyclobenzaprine, gabapentin, Methocarbamol, Methylprednisolone, and oxycodone-acetaminophen for back-related conditions, in addition to other medications for unrelated conditions (tr. 523–24). On July 13, 2015, Plaintiff presented to Dr. Belk, noting she was applying for Social Security disability benefits; she requested that disability-related paperwork be filled out for her (tr. 519, 521).

In September 2015, Plaintiff presented to Dr. Belk with complaints of right hip pain (tr. 593). A physical examination revealed tenderness over the greater trochanter of the right hip, and Dr. Belk prescribed Oxycontin (tr. 595). When Plaintiff returned in October 2015, she reported the Oxycontin caused nausea and headaches (tr. 589). Dr. Belk switched Plaintiff to oxycodone-acetaminophen, 10-

325 mg tablets up to five times a day for pain (tr. 592). He continued the new prescription at the same level at Plaintiff's next visit in December 2015, with no complaints of side effects noted; he also added one Oyxcontin 30 mg tablet per day, to be taken in the morning (tr. 584–87). This is the last treatment record from Dr. Belk.

In 2016, Plaintiff sought treatment at the Naval Hospital for venous insufficiency, colonic polyps, removal of back moles, and carpal tunnel syndrome (tr. 609–64). Notably, these treatment records reflect Plaintiff did not appear to be uncomfortable and/or that her gait and stance were "normal" (*see, e.g.*, tr. 609–15, 628, 632, 633). Plaintiff also reported a "[g]ood general overall feeling/health" (*see, e.g.*, tr. 612, 626, 631) and that she engaged in "150 minutes of moderate intensity exercise per week AND muscle strengthening activities 2 or more days per week" (tr. 612 (emphasis in original)).

On January 10, 2017, more than a year after Plaintiff last saw Dr. Belk or received any treatment for her back, Plaintiff returned to the Gulf Coast Pain Institute complaining of back and leg pain (tr. 648). Plaintiff completed a form titled "Pain Disability Index," on which she reported chronic or disabling pain, ranging from an eight to a ten on a ten-point scale, in all seven aspects of her life referenced on the form (tr. 658). Similarly, she described chronic and debilitating pain to ARNP

Audrey M. Sisney (e.g., "aching, sharp, shooting, constant" that increased with minimal movements) (tr. 648–54). Plaintiff also advised ARNP Sisney she was "currently on 3 Percocet a day, [which was] a reduction from when Dr. Belk was managing at 5 a day" (tr. 648). Plaintiff noted the medication "decreased" her pain, provided "good" relief, and "improved" her functioning (tr. 648–49). The only side effect she reported was constipation (tr. 649). ARNP Sisney initially assessed "[s]tatus post lumbar spine surgery, failed" (tr. 648). She then conducted a physical examination, during which she noted Plaintiff arose without difficulty, had a normal gait, and had not required any type of bracing to assist with pain control in the past two years (tr. 649–50). ARNP Sisney did note that Plaintiff's lower back appeared to exhibit a diminished lordosis and that Plaintiff has some limited ROM with extension and lateral rotation and bending, as well as some tenderness to palpation (tr. 650–51). However, a sensory and neurological examination was normal in the bilateral lower extremities, and no other abnormalities were noted upon examination (*see id*.). ARNP Sisney diagnosed fibromyalgia; sciatica, unspecified side; post-laminectomy syndrome, not elsewhere classified; other intervertebral disc degeneration, lumbar region; and "spondyls [sic] w/o myelopathy or radiculopathy, lumbocacr [sic] region" (tr. 651). She prescribed Percocet (tr. 652).

C.    Other Information Within Plaintiff's Claim File

On July 13, 2015, Dr. Belk completed a "Clinical Assessment of Pain" form, which Plaintiff's counsel provided him (tr. 563–64). He assessed lumbar spondylosis with myelopathy and, by selecting pre-printed options on the form, opined that Plaintiff's "[p]ain will distract [her] from adequately performing daily activities or work"; that physical activity will "greatly increase [her] pain and cause distraction from task or total abandonment of task"; and that her "pain and/or drug side effects can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc." (tr. 563). He noted Plaintiff had been prescribed oxycodone and anticipated Plaintiff requiring pain management in the next year (tr. 564). In a narrative section of the form, Dr. Belk opined Plaintiff should refrain from squatting, lifting more than ten pounds, and driving public vehicles (*id*.). Last, he felt Plaintiff was not capable of "gainful employment," as defined on the form (*see id*.).

Michael Kasabian, D.O., examined Plaintiff on September 23, 2015, at the Commissioner's request (tr. 575–79). His physical examination revealed negative straight leg tests in both sitting and supine positions, full muscle strength ("5/5") in all four extremities, a grossly normal gait without an assistive device, normal fine grip dexterity, intact sensation to light touch in all four extremities, and deep tendon reflexes at "+2/4" in all four extremities (tr. 575). The only deficits noted were with

range of motion ("ROM") testing, where Dr. Kasabian noted Plaintiff's back to be "very tender" at L4-5 (*id*.) and limited with forward flexion (to 60 degrees out of a maximum of 90) and extension and lateral flexion (to 15 degrees out of a maximum of 25) (tr. 577). Otherwise, Plaintiff had full ROM in all areas tested, including the cervical spine and bilateral hips and knees (tr. 577–79).

Steve Hirschorn, Ph.D., conducted a psychological consultative examination of Plaintiff on September 30, 2015 (tr. 581–83). Plaintiff advised Dr. Hirschorn she could get up each morning, dress, take care of her hygiene, cook, drive, and perform some housework and light grocery shopping (tr. 582–83). Dr. Hirschorn noted Plaintiff seemed to "shift uncomfortably" throughout the assessment (tr. 582). Although Plaintiff reported pain, she stated she had "25 or 28 good days per month" (tr. 581). Dr. Hirschorn assessed adjustment disorder with depressed mood, mild, in partial remission (tr. 582). He also opined Plaintiff's chronic pain was the "only obstacle to employment" (tr. 583).

Loc Kim Le, M.D., a non-examining state agency physician, offered an opinion on November 3, 2015, after reviewing Plaintiff's claims file at the reconsideration level of review (tr. 97–99). Dr. Le opined Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand and/or walk for six hours in an eight-hour workday with normal breaks (tr. 98). Dr.

Le found Plaintiff capable of performing light work—namely, her former work as a daycare worker—and thus not disabled under the Act (tr. 99–100). In support of his conclusions, Dr. Le cited Plaintiff's activities of daily living and several medical records from 2014 and 2015 (tr. 98), including the results of Dr. Kasabian's examination (tr. 95). He also noted he had reviewed Dr. Belk's Clinical Assessment of Pain form and general opinion that pain or other limitations would preclude Plaintiff from working, but he observed that Dr. Belk assessed no specific functional limitations or restrictions, such as those related to standing, walking, or sitting (tr. 92–94).

In an undated letter (tr. 318), which bears a facsimile date stamp of February 16, 2017, and was submitted as evidence shortly before Plaintiff's hearing (*see* tr. 58), Plaintiff's former employer verified Plaintiff was employed in "management, as the bus driver and a teacher" for Malena's Mini Schools from 1999 to 2015 (tr. 318). The employer stated that Plaintiff initially worked full-time, five days a week for eight to ten hours a day, but over the years her health "deteriorated," and eventually she only worked in the classroom as an assistant teacher four days per week, for three to four hours per day (*id*.). The employer did not address Plaintiff's health issues, specify when Plaintiff's health deteriorated, or state when Plaintiff reduced her work hours (*see id*.).

Finally, James Miller, a vocational expert ("VE"), testified at the hearing (tr. 72–74). He classified Plaintiff's past work as a daycare teacher as semi-skilled and performed at the light exertional level (tr. 74).

V.     DISCUSSION

Plaintiff argues the ALJ committed reversible error in: 1) failing to assign controlling weight to the opinions of Plaintiff's treating physician, William Belk, and 2) failing to support his RFC determination with substantial evidence.

A.     Treating Physician Rule

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1439–41; *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Chater*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(c). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly

conclusory. *See Edwards*, 937 F.2d at 580 (finding the ALJ properly discounted a treating physician's report where the physician was unsure of the accuracy of his findings and statements). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527 (c)(2).

Plaintiff contends the ALJ erred in assigning "little weight" to the opinions of Dr. Belk, as set forth on the Clinical Assessment of Pain form, because the ALJ did not discuss or properly consider certain portions of the record that purportedly are

consistent with those opinions (*see* ECF No. 15 at 3–5). The record shows the ALJ articulated valid reasons for giving Dr. Belk's opinions little weight (*id*.).

First, the ALJ found the record lacked objective evidence to support the functional limitations and restriction to sedentary work Dr. Belk imposed (tr. 17). For example, the ALJ pointed to Dr. Kasabian's examination, which revealed negative straight leg raising tests, full muscle strength in all extremities, and a normal gait (tr. 16, 575). The ALJ also considered Plaintiff's activities of daily living and conservative course of treatment (tr. 16). The ALJ referenced the Naval Hospital's treatment records, which included multiple references to Plaintiff's normal gait and stance (*id*.), [7] as well as Plaintiff's "good general overall feeling/health." The ALJ additionally considered that when Plaintiff returned to the Gulf Coast Pain Institute in January 2017 and saw ARNP Sisney, Plaintiff reported that her medications provided good pain relief (*id*.). Last, and perhaps most important, the ALJ noted that during the course of Dr. Belk's treatment, Dr. Belk never noted any objective limitations or restricted Plaintiff's activity in any manner (tr. 519–61). *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (*citing Brown v.*

---

[7] Plaintiff complains the Naval Hospital records, which the ALJ characterized as "fail[ing] to identify any serious limitations" (tr. 17–18), focused on treatment for venous insufficiency and other conditions and thus were not reflective of Plaintiff's back condition (ECF No. 15 at 5, citing tr. 599–647). Although these records do center around treatment for conditions not directly relevant to Plaintiff's back condition, objective observations were nevertheless made as part of this treatment, were recorded by Naval providers, and were properly considered by the ALJ.

*Chater*, 87 F.3d 963, 964–65 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability)).   He did so *only* on the form provided to him by Plaintiff's counsel, not contemporaneously with his treatment of Plaintiff.   In sum, the ALJ's decision to give Dr. Belk's opinion little weight is supported by substantial evidence in the record.

Plaintiff contends the ALJ nevertheless erred because he failed to adequately consider certain portions of the record that purportedly are consistent with Dr. Belk's opinion.   Specifically, Plaintiff points to: (1) a prescription for a back brace in 2014; (2) the ESI's; (3) Dr. Hirschorn's psychological evaluation, during which she was noted to "shift uncomfortably"; (4) ARNP Sisney's assessment of "failed" lumbar spine surgery; and (5) the undated letter from her employer.

An ALJ is not tasked with citing every piece of evidence of record.   *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) ("there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision").   More importantly, the records referenced by Plaintiff do little to support her contention of disability, as the evidence cited does not equate to a functional limitation.   *See, e.g.*, *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) ("the "severity" of a medically ascertained disability must be measured in terms of its effect upon ability

to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality").

Although Plaintiff's contentions warrant little discussion, the undersigned will briefly address each.

Prescription for a Back Brace — On December 2, 2014, prior to the relevant period, ARNP Byrd (with Dr. Goodman's office) met with Plaintiff and explained her CT scans were normal. She also conducted a physical examination, which yielded normal results. ARNP Byrd's office did not prescribe pain medication but referred Plaintiff for such (*see* tr. 429). ARNP Byrd prescribed a "corset for comfort" (*id.*). If anything, this treatment record—including the prescription for a corset but not for pain medication—from the office of Plaintiff's treating neurosurgeon/specialist, undermines her claim of disabling pain and limitations. *See, e.g., Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (ALJ may consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony).

Spinal Injections — The ESI's to which Plaintiff refers were administered in April and May 2015, prior to the relevant period; the ALJ nevertheless considered them (tr. 15). As the ALJ noted, the injections further demonstrate a course of conservative care, resulting in improvement in Plaintiff's pain and allowing Plaintiff

to retain the "ability to move about freely and independently [and] to function on a daily basis" (tr. 16). Moreover, the ESI's were administered at the Gulf Coast Pain Institute, to which Plaintiff returned in January 2017, within the relevant period. The January 2017 records, which clearly *are* relevant, reflect "good" pain relief with medication, a largely normal physical examination, and no recommendation for any additional injections. Thus, evidence relating to the injections does not undermine the ALJ's findings as to Dr. Belk's opinions.

Comment by Dr. Hirschorn as to Plaintiff "Shift[ing] Uncomfortably" —

The ALJ did not reference this comment, but the ALJ also did not reference Plaintiff's comment to Dr. Hirschorn that despite alleged pain, she still had 25 to 28 good days per month. As noted *supra*, the ALJ need not reference every piece of evidence. The question is whether the ALJ's decision enables a reviewing court to determine whether he considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1211 (*citing Foote*, 67 F.3d at 1562). It is clear the ALJ in fact considered Plaintiff's condition as a whole, and there is no error in this regard.

ARNP Sisney's Assessment of "Lumbar Spine Surgery, Failed" — The "failed" back surgery notation appears to have been made by ARNP Sisney upon her *initial* encounter with Plaintiff after reviewing Plaintiff's pain questionnaire and interviewing her. The notation appears on the first page of the treatment note, just

below a section titled "[Plaintiff's] chief complaint" (tr. 648). Later, *after* ARNP Sisney examined Plaintiff and made objective findings remarkably similar to those made by Dr. Kasabian, she "diagnosed" Plaintiff (on page four of the report) with five conditions, *excluding* failed back surgery (tr. 651). It thus appears the initial assessment was based upon Plaintiff's subjective complaints of pain and not on a review of Plaintiff's medical records (e.g., CT scans) or examination/observations of Plaintiff. To be sure, the *treating neurosurgeon's* records do not characterize either surgery as "failed." [8] Further, ARNP Sisney assessed no functional limitations, recorded Plaintiff's reports of "good" relief with pain medication, and noted Plaintiff's ability to arise without difficulty and walk with a normal gait (tr. 648–51). Thus, the ALJ committed no error by failing to mention the "failed back surgery" notation in his decision. *See, e.g., East v. Barnhart*, 197 F. App'x 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination).

The Undated Letter from Plaintiff's Employer — Put simply, this letter is of no probative value or consequence. It is merely a recitation of Plaintiff's employment history at the daycare, including her reduction in hours over the years

---

[8] As previously noted, the CT scans ordered by Dr. Goodman show Plaintiff's surgeries were successful. Moreover, Dr. Goodman had no explanation for Plaintiff's pain and, in fact, released her to full-time work (i.e., "regular duties") in January 2012.

(tr. 318). It lacks specifics and includes no relevant observations regarding Plaintiff's functional limitations aside from a general assertion that Plaintiff's "health deteriorated" (tr. 318). It also is somewhat duplicative of Plaintiff's testimony and statements. Therefore, there is no error in failing to mention it. *De Olazabal v. Soc. Sec. Admin., Comm'r*, 579 F. App'x 827, 832 (11th Cir. 2014) (harmless error in ALJ's failure to mention third-party's report (claimant's husband) where "report was merely cumulative of [claimant's] own testimony and the medical evidence in the record").

As a final matter, Plaintiff states the ALJ substituted his own medical opinion in violation of Social Security Ruling ("SSR") 96-6p and *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992). SSR 96-6p requires an ALJ to consider the opinions of state agency consultants and explain the weight given such opinions. SSR 96-6p, 1996 WL 374180. In his decision, the ALJ appropriately addressed and reconciled the medical evidence of record; assigned weight to the various medical opinions, including those of state agency consultants; and offered explanations for each finding (tr. 17–18). He did not rely upon or substitute his own medical opinion to make findings, as Plaintiff contends. Additionally, Plaintiff's reliance on *Marbury* is misplaced, as the court merely held there that an ALJ abuses his discretion when he discounts a treating physician's opinion *without articulating valid reasons for*

*doing so* and fails to support his conclusions with substantial evidence. *Marbury*, 957 F.2d at 841. Here, as discussed above, the ALJ articulated reasons for discounting Dr. Belk's opinion, and those reasons are supported by substantial evidence in the record, as is his assignment of weight to the other medical opinions of record.

B. RFC Determination

Plaintiff argues the ALJ's RFC determination was not based on substantial evidence.[9] RFC is an assessment, based upon all the relevant evidence, of a claimant's ability to work despite impairments. *See Lewis*, 125 F.3d at 1440. As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite her limitations. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence—that is, evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC based on all the relevant, credible evidence of record. *See Phillips*, 357 F.3d at 1238;

---

[9] Plaintiff claims this error occurred at the "fifth step" of the sequential evaluation (ECF No. 15 at 6); however, step five is only at issue when a claimant cannot perform past relevant work. Here, at step three, the ALJ restricted Plaintiff to light work, and at step four he found her capable of performing her past work (tr. 14–18). Hence, the burden to show that other work exists in the national economy never shifted to the ALJ at step five. It thus appears Plaintiff's argument concerns the ALJ's RFC determination at step four.

*McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of limitations); *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding). *See also* 20 C.F.R. §404.1545; SSR 96-8p.

Plaintiff's arguments relating to the RFC determination are not entirely clear, so the undersigned will address them to the extent they can be discerned. Moreover, certain arguments in support of this claim are repetitive of those made in support of the first claim (e.g., the ALJ erred in considering the Naval Hospital's records and "Exhibit 16F" (i.e., ARNP Sisney's treatment notes from January 2017)) (*see* ECF No. 15 at 7–8), so those arguments need not, and thus will not, be addressed.

Plaintiff appears to complain primarily about the ALJ's consideration of Dr. Kasabian's findings. She contends the ALJ did not consider the ROM limitations assessed by Dr. Kasabian and failed to acknowledge Dr. Kasabian offered no opinion regarding functional limitations (*id*. at 7). As detailed above, although Dr. Kasabian found some reduced ROM in Plaintiff's lumbar spine, he also found negative straight leg testing, 5/5 strength in all extremities, intact sensation in all

extremities, a normal gait without an assistive device, an ability to stand on heels and toes, and normal ROM in all other areas tested, including the hips and knees (tr. 575–79). In characterizing these findings, the ALJ stated that Dr. Kasabian found "no *serious* limitations" (tr. 17) (emphasis added). This characterization is accurate, given that Dr. Kasabian found only minor ROM abnormalities, of which the ALJ obviously was aware and considered—otherwise, the ALJ would have characterized the examination as resulting in "*no* limitations." Plaintiff's argument that the ALJ failed to consider the reduced ROM findings thus is without merit.

Likewise, Plaintiff's contention the ALJ should have disregarded Dr. Kasabian's findings because he assessed no specific functional limitations fails. As the Tenth Circuit noted:

> [T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question. "[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004) (following 20 C.F.R. § 416.927(e)(2) and SSR 96–59, 1996 WL 374183, at *5); *see also* 20 C.F.R. §§ 404.1546(c) and 416.946(c). We have thus "rejected [the] argument that there must be specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category." *Howard*, 379 F.3d at 949; *see, e.g.*, *Wall [v. Astrue]*, 561 F.3d [1048,] 1068–69 [(10th Cir. 2009)] (upholding ALJ's findings on mental impairment where record did not contain any treating or examining medical opinions as to allegedly disabling pain disorder); *Bernal v. Bowen*, 851 F.2d 297, 302–03 (10th Cir. 1988) (holding ALJ properly made mental RFC findings without expert medical assistance).

*Chapo v. Astrue*, 682 F.3d 1285, 1288–89 (10th Cir. 2012) (footnote omitted).

Thus, it would have been *improper* for the ALJ to discredit Dr. Kasabian's opinion due to a lack of accompanying functional limitations. The ALJ had a duty to assess Plaintiff's RFC based on *all* the relevant, credible evidence of record, including the opinion of Dr. Kasabian, and the ALJ did so.

The ALJ specifically noted he reviewed the "entire record" (tr. 16), all symptoms to the extent they could reasonably be accepted as consistent with the objective medical evidence of record (tr. 14), and the opinion evidence (tr. 15). The ALJ also pointed directly to Plaintiff's conservative treatment, which consisted of injections and pain medication and which was generally successful in treating her symptoms of pain (tr. 16, *citing* tr. 496 (Plaintiff reported "50% relief" of pain); tr. 648 (Plaintiff's medications "decreased" pain and "improved functioning")). *See, e.g., Wolfe* 86 F.3d at 1078; *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (citations and quotation omitted); *Woodum v. Astrue*, No. 8:07cv404, 2008 WL 759310, at *3 (M.D. Fla. Mar. 20, 2008) (ALJ properly considered that "limited and conservative treatment . . . is inconsistent with the medical response that would be expected if the physician(s) found the symptoms and limitations to be as severe as reported by the claimant").

Additionally, as previously noted, the ALJ pointed out that despite Plaintiff's continued complaints of pain, she retained the ability to move about and ambulate freely and function independently on a daily basis (tr. 16, *citing* tr. 649 ("no type of bracing" to assist with pain); tr. 650 ("arises without difficulty" and "gait WNL [within normal limits]")). The ALJ also noted these findings were consistent with Plaintiff's own reports to Dr. Hirschorn that she was able to engage in various activities, operate a vehicle, care for her personal needs, perform household chores, and go grocery shopping once a week (tr. 16, *citing* tr. 582). Finally, the ALJ acknowledged that while Plaintiff does have a medically-severe physical impairment that causes exertional limitations, her limitations are appropriately accounted for in the RFC limitation to light work. Based on all of the foregoing, the court finds no error with respect to the ALJ's RFC determination.

## VI.    CONCLUSION

As discussed extensively herein, the Commissioner's decision is supported by substantial evidence in the record and should not be disturbed. 42 U.S.C. § 405(g); *Lewis*, 125 F. 3d at 1439; *Foote*, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is hereby **ORDERED**:

1.      The clerk of court is directed to substitute Andrew Saul for Nancy A. Berryhill as Defendant.

2.      The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

3.      **JUDGMENT** is to be entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

4.      The Clerk is directed to close the file.

At Pensacola, Florida this 16th day of December 2019.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**